# Illinois Official Reports

## Appellate Court

---

### *People v. Wilson*, 2014 IL App (1st) 113570

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RAYVONNE WILSON, Defendant-Appellant. |
| District & No. | First District, Fifth Division<br>Docket No. 1-11-3570 |
| Filed | September 12, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's second *pro se* postconviction petition alleging that his counsel was ineffective in failing to raise the issue of an improper closing argument by a prosecutor was properly dismissed as frivolous and patently without merit, regardless of the fact that the trial court's written order was unclear as to whether the petition was dismissed based on the cause-and-prejudice test or the frivolous-and-patently-without-merit test, since the appellate court may affirm on any basis in the record, and in defendant's case, the prosecutor's comments that the eyewitnesses hesitated in cooperating with the police due to their fear of defendant were based on reasonable inferences from the evidence and could not be deemed improper, and even if the comments were improper, they were not a material factor in his conviction; therefore, there was no basis for claiming defendant's counsel was ineffective in failing to raise the issue on appeal. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 05-CR-10935; the Hon. Kenneth J. Wadas, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Michael J. Pelletier, Alan D. Goldberg, and Tomas G. Gonzalez, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Michelle Katz, and Mari R. Hatzenbuehler, Assistant State's Attorneys, of counsel), for the People.

Panel

JUSTICE REYES delivered the judgment of the court, with opinion.
Justice Hall concurred in the judgment and opinion.
Justice Lampkin specially concurred, with opinion.

**OPINION**

¶ 1     Defendant Rayvonne Wilson appeals from an order of the circuit court of Cook County summarily dismissing his second *pro se* postconviction petition (second *pro se* petition) for relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2010)). Defendant contends the circuit court erred in summarily dismissing his second *pro se* petition. Wilson argues: (1) his second *pro se* petition was not a successive petition because he only sought to reinstate his right to a direct appeal in his initial petition; and (2) the second *pro se* petition set forth the gist of an arguable claim that his appellate counsel was ineffective for failing to raise an issue on direct appeal concerning the improper closing argument by the Cook County assistant State Attorney's (ASA). For the reasons that follow, we affirm.

¶ 2                                    BACKGROUND

¶ 3     On September 17, 2004, defendant allegedly shot and killed Kevin Blaylock (Blaylock) at 69th Street and Ashland Avenue in Chicago. On April 10, 2005, defendant was arrested in the state of California and subsequently extradited to Illinois. A trial was held on February 26, 2008. The State's case relied on the testimony of three identification witnesses: Zallassio Sain (Sain), Eric Carter (Carter), and Rodney Ware (Ware). Throughout the proceedings, defendant maintained he was not the shooter and challenged the credibility of Sain, Carter, and Ware.

¶ 4     At trial, Sain testified that in September 2004, he was living in Indiana and Wisconsin but came to Chicago every day. On the evening of September 16, 2004, he was standing outside 70th Street and Honore Street in Chicago with a group of people, drinking cognac and smoking marijuana. Carter and Ware were among the individuals present. Blaylock joined the group, and shortly thereafter, Sain and Blaylock got into Sain's sister's vehicle and drove to a liquor store and then to Sain's girlfriend's house. Subsequently, Sain called Ware because he had left his phone charger in Ware's automobile, and then met with Ware at a restaurant located at 69th Street and Ashland Avenue. Sain walked up to Ware's vehicle, and as he spoke to Ware, he observed Blaylock approach them. At the same moment, Sain observed defendant for the first

time. Defendant was two feet away from Sain and was approaching Blaylock on foot. Sain recognized defendant because he had known him for a couple of months. Sain communicated to Blaylock to "watch out" because defendant and Blaylock had "gotten into it" a couple of weeks before. Defendant then "upped the gun" and began shooting at Blaylock, who had started running away from defendant. Sain heard seven or eight gunshots. Sain went to look for Blaylock and found him lying facedown on the ground near the restaurant with two bullet wounds in his back. Sain tried to place Blaylock in the vehicle so he could drive Blaylock to the hospital, but in the meantime the police arrived and called an ambulance. When the police questioned Sain, he stated his name was "Tyrone Smith" because there were outstanding warrants for his arrest in Wisconsin. For the same reason, Sain did not inform the police he had observed what had happened. After the ambulance arrived, Sain left. Later that morning, Sain informed Blaylock's grandmother he had observed the shooting. Sain testified that before he spoke with the police he met with Carter and Ware a week or two after the shooting.

¶ 5 Sain further testified he was eventually arrested for the outstanding warrants and placed in the Dane County jail in Madison, Wisconsin, where he was convicted of armed robbery and burglary. On April 10, 2005, while Sain was in custody in Wisconsin, detectives and an ASA from Cook County visited him and inquired as to what he had observed on September 17, 2004. The detectives and ASA made no promises to Sain regarding his convictions in Wisconsin. During this visit, Sain gave a handwritten statement about what he had observed and identified defendant in a photo array as the shooter. Sain also admitted that at the time of the shooting he was a member of the Gangster Disciples street gang.

¶ 6 Carter testified that when Sain and Blaylock left 70th Street and Honore Street, he, Ware, and two other individuals drove around in Ware's vehicle looking for some girls. After they met with Sain at the restaurant, Carter observed Blaylock approach Ware's vehicle and heard Sain communicate to Blaylock to "watch out." Carter then heard gunshots and observed defendant 10 feet away shooting a handgun at Blaylock. Carter heard eight or nine gunshots. Carter then observed defendant, whom he knew through a friend, running back the way he arrived. Carter, Ware, and the two other people in Ware's automobile left the restaurant after the shooting. Carter later spoke to Blaylock's uncle about what had happened. Carter did not speak to the police that day because he "wasn't trying to get involved." Carter testified he met with Sain and Ware later that morning and discussed the shooting.

¶ 7 Carter further testified that on September 29, 2004, a police officer approached Carter on the street and requested that he go to the police station, where Carter informed detectives about what had happened and identified defendant as the shooter in a photo array. In December 2004, after speaking to the police and an ASA, Carter gave a handwritten statement and again identified defendant in a photo array as the shooter. On April 18, 2005, Carter testified in front of a grand jury that defendant was the shooter.

¶ 8 On cross-examination, Carter further stated he had previously failed to appear in court pursuant to a subpoena because he "didn't want to get involved." Carter admitted he had been previously convicted of a narcotics offense in Illinois and successfully completed his sentence. Carter acknowledged he was a member of the Gangster Disciples street gang when the shooting occurred and at the time of this testimony.

¶ 9 Ware also testified about the events surrounding the shooting. Ware testified when he and Sain were at the restaurant, Blaylock approached Ware's vehicle and he heard Sain yell "watch out." Ware observed defendant "standing right there," five feet away from his vehicle,

- 3 -

shooting at Blaylock. At the time of the incident, Ware had known defendant for approximately a year and a half. Ware heard six or seven shots as defendant continued shooting at Blaylock while Blaylock was running across the street. Ware did not observe anything in Blaylock's hands. Ware then observed Sain drive his vehicle toward Blaylock. Ware later learned from Blaylock's uncle that Blaylock had been killed, and he informed the uncle about what he had observed. Ware testified he met with Sain and Carter later that day and discussed the shooting "just a little bit." Ware stated he did not go to the police immediately, but on December 1, 2004, he learned the police wanted to speak with him and he went to the police station. There, Ware identified defendant in a photo array as the shooter and signed a statement. On April 18, 2005, Ware testified at a grand jury proceeding that defendant shot Blaylock. Ware explained he had previously failed to appear in court pursuant to a subpoena because he "was scared a little bit," but that he had turned himself in when he heard there was a warrant out for his arrest. Ware admitted he had a felony narcotics conviction from 2002, for which he received probation. Ware also admitted he was currently a Gangster Disciple.

¶ 10    Chicago police officer Maurice Conely (Officer Conely) testified that while he was on patrol duty on September 17, 2004, at 2:30 a.m., he observed four or five individuals gathered near 69th Street and Ashland Avenue. Officer Conely observed Blaylock lying on the sidewalk bleeding from a gunshot wound and observed a witness who identified himself as "Tyrone Smith" trying to place Blaylock into a vehicle. Tyrone Smith identified himself as Blaylock's friend and stated he heard five or six gunshots and then found Blaylock lying on the ground. Officer Conely informed Tyrone Smith an ambulance was coming and went to the location where the shooting had occurred. When Officer Conely returned to 69th Street and Ashland, Tyrone Smith was gone.

¶ 11    Detective Dominick Doris (Detective Doris) of the Chicago police department testified that while working on the investigation of Blaylock's homicide, he learned defendant had been identified as the shooter. Efforts to locate defendant in Chicago were unsuccessful and an investigative alert was issued. On April 10, 2005, defendant was extradited from the state of California to Chicago, where he was arrested for Blaylock's murder on April 18, 2005. Detective Doris also testified the cartridge casings found at the scene indicated the firearm used to kill Blaylock was a semiautomatic handgun, but no weapon was recovered to his knowledge.

¶ 12    Detective Glen Turner (Detective Turner) testified he became involved in the homicide investigation on September 18, 2004. Detective Turner stated he spoke with Blaylock's grandmother and cousin, and they gave the street names of "Maurice," "Rod," "Poon," "Scrill," "B," and "Chew" as individuals that may have observed the incident. Detective Turner testified he was also given an address for Chew where he spoke with Beatrice Wilson, a relative of Chew, and learned Chew's real name was Rayvonne Wilson, the defendant. Detective Turner confirmed that many unsuccessful attempts were made to locate defendant in Chicago.

¶ 13    Detective Luis A. Otero (Detective Otero) testified that on September 29, 2004, a possible witness to the shooting known as Poon was brought to the police station. Detective Otero testified Poon identified himself as Carter and picked defendant out of a photo array as Chew, the person he observed shooting Blaylock on the night of the incident.

¶ 14    A stipulation was entered into by the parties as to the testimony of Cook County medical examiner Eupil Choi that Blaylock died of multiple gunshot wounds and the manner of death

- 4 -

was homicide. A certified copy of the postmortem exam and autopsy photographs were entered into evidence. Another stipulation pertaining to Blaylock's blood and urine testing negative for narcotics and positive for alcohol was entered into by both sides. Defendant did not testify or present any witnesses in his defense.

¶ 15　　During closing argument, the ASA asserted there was no question that defendant was the shooter because he committed the act in front of people who were Blaylock's friends and knew defendant. The ASA contended "we know [defendant] is the individual who killed" Blaylock because he was identified over and over by Sain, Carter, and Ware. The ASA also summarized the reasons why the witnesses did not immediately go to the police: Sain testified he "just didn't want to get involved" because he had outstanding warrants, Carter testified he did not want to get involved, and Ware testified he did not want to get involved and was afraid. The ASA further noted that although Sain did not want to get involved, he also did not inform the police someone else was the shooter. The ASA then stated:

> "Why, ladies and gentlemen, do you think these three individuals, who are great friends with Kevin Blaylock, didn't want to get involved? Because they know what this man is capable of."

Defense counsel objected. The trial court overruled the objection. The ASA continued with closing argument:

> "They know that the defendant is capable of killing someone right in front of them. They know, and they saw the defendant pull a weapon out in front of them and continue to fire over and over at an unarmed man who is running away. They know that, ladies and gentlemen. They knew that on September 17th, so they didn't call the police. But what they did do is they talked to the family. *** They told the grandmother of Kevin Blaylock ***. They told the uncle of Kevin Blaylock ***. They had come forward. They had done the right thing."

¶ 16　　The ASA also argued defendant "was banking on" the fact that the witnesses did not want to be involved, which is why he killed Blaylock in the early morning hours in front of Blaylock's friends.

¶ 17　　Additionally, the ASA stated:

> "[Sain's, Carter's, and Ware's] testimony is corroborated by the physical evidence. And also the reasonableness of their testimony, because they feared the defendant. They feared him because of what they saw him do. So is it reasonable that they didn't come forward? Perhaps. Is it something that another individual may have done? Who knows. But they are individuals that live over there, they're friends with the people over there, and make no mistake about it, yes, they're in a gang. *** And yes, perhaps Kevin Blaylock was also a Gangster Disciple and was in a gang. However, this defendant doesn't get to choose the life worth of Kevin Blaylock."

¶ 18　　Defense counsel contended the State's version of the incident did not make sense and noted the lack of physical evidence that tied defendant to the shooting. Defense counsel also contended the three witnesses were not believable. Further, defense counsel asserted the evidence demonstrated defendant was older than the witnesses, and while they testified they knew of him, that did not mean the witnesses actually knew him. Defense counsel argued the witnesses were gang members and "kind of controlled this investigation, if you think about it."

Defense counsel asserted if Sain, Carter, and Ware had wanted to lead the police to other people who were present, they could have done so.

¶ 19    In rebuttal, the ASA pointed to specific circumstances surrounding the shooting, asserting Sain's alert to "watch out" meant he recognized defendant as a specific threat to Blaylock. The ASA also commented on various pieces of evidence he asserted corroborated the witnesses' testimony. The ASA contended the witnesses' lack of cooperation was not the type of behavior expected from people out to frame defendant. The ASA asserted when they finally spoke with the police, it would have been easy for the witnesses to say they did not observe anything, but instead they informed the police what had happened. The ASA concluded by asserting that if the jury were to look at why the witnesses tried to avoid coming to court, "it tells you one thing. They don't want to be here, they don't want to tell the truth, but they are."

¶ 20    Following jury instructions and deliberations, the jury found defendant guilty of first degree murder and found that during the commission of the offense, defendant personally discharged a firearm that proximately caused Blaylock's death. At sentencing, the trial court found no mitigating factors applicable and found the following aggravating factors: (1) petitioner's conduct did cause or threaten serious harm; (2) petitioner had an "extensive" history of prior delinquency or criminal activity; and (3) the sentence was necessary to deter others from committing the same crime. The trial court also found that a number of defendant's prior crimes involved weapons and/or death to another individual, and that one case was an involuntary manslaughter for which defendant was sentenced to the California penitentiary, and another was an assault with a firearm. The trial court noted defendant's "extensive" criminal background, defendant's "propensity to carry weapons," and that "[p]eople around [defendant] wind up dead on more than one occasion." On May 1, 2008, the trial court sentenced defendant to the maximum of 60 years in prison on the charge of first degree murder with a 50-year enhancement for personally discharging a firearm.

¶ 21                           Initial Postconviction Petition

¶ 22    On May 28, 2009, defendant filed a postconviction petition in which he claimed he had been denied effective assistance of counsel due to his trial counsel's failure to file a notice of appeal. Defendant's petition was supported by a notarized affidavit from his trial counsel in which trial counsel averred he was appointed to represent defendant and that defendant expressed his desire to pursue a direct appeal. Trial counsel further attested that defendant relied on him to execute the notice of appeal, but that he "neglected to file Wilson's notice of appeal." On June 29, 2009, the circuit court granted defendant's requested relief and he was granted leave to file a late notice of appeal.

¶ 23                                   Direct Appeal

¶ 24    On direct appeal, defendant argued: (1) his conviction should be reversed because the circuit court violated amended Illinois Supreme Court Rule 431(b) (eff. May 1, 2007), as it did not question the prospective jurors as to whether they understood and accepted that defendant was not required to produce any evidence on his own behalf and that defendant's failure to testify could not be held against him; (2) the circuit court erred by not giving the jury the definition of "reasonable doubt" when the jury requested the definition during deliberations; (3) his sentence was excessive and should be reduced because the circuit court considered a factor inherent in the offense; and (4) the mittimus should be corrected to reflect only one

conviction for first degree murder. On December 15, 2010, this court affirmed defendant's conviction and sentence and corrected the mittimus to reflect one conviction for first degree murder. *People v. Wilson*, No. 1-09-1815 (2010) (unpublished order under Supreme Court Rule 23).

Second *Pro Se* Postconviction Petition

On June 24, 2011, defendant filed a second *pro se* postconviction petition. Defendant contended his appellate counsel was ineffective for not raising his trial counsel's failure to: (1) object to the ASA's remarks in closing argument that the witnesses feared being shot and killed by defendant; (2) object to the ASA's misstatement of evidence that Sain feared defendant; (3) object to the ASA's improper "shifting of the burden" to defendant; (4) object to defendant not being present for the reading of and response to the jury's notes; and (5) raise on appeal that the ASA improperly implied defendant "fled" the State of Illinois to avoid prosecution for the victim's murder. Defendant's petition was signed pursuant to section 1-109 of the Code of Civil Procedure (735 ILCS 5/1-109 (West 2010)). In addition, defendant attached an unnotarized affidavit in which he averred no transcripts were attached to his petition because they were taken by prison officials during a "routine cell shake-down." Defendant further averred that he "has attempted to get the records back and have [*sic*] been told that the documents (transcripts) will be returned as soon as possible."

On August 19, 2011, the circuit court dismissed defendant's second *pro se* petition. In its written order, the circuit court found that defendant's petition was a successive postconviction petition. The circuit court then analyzed the petition and determined it failed to meet the "cause-and-prejudice" test to obtain leave to file a successive petition. Specifically, the circuit court found defendant failed to: (1) identify any objective factor which impeded his efforts to raise the claims in the earlier petition; and (2) demonstrate any prejudice inured from his failure to assert the claims earlier because "[h]ad they been presented in the initial petition, there is scant probability that petitioner would have prevailed." After analyzing defendant's second postconviction petition under the cause-and-prejudice test, the circuit court stated in its conclusion that the issues raised in defendant's petition were "frivolous and patently without merit." On December 22, 2011, this court granted defendant's request to file a late notice of appeal.

ANALYSIS

On appeal, Wilson maintains the circuit court erred in summarily dismissing his second *pro se* petition. Wilson argues: (1) his second *pro se* petition was not a successive petition because he only sought to reinstate his right to a direct appeal in his initial petition; and (2) the second *pro se* petition set forth the gist of an arguable claim that his appellate counsel was ineffective for failing to raise an issue on direct appeal concerning the ASA's improper closing argument. We note that defendant does not raise the other arguments contained in his second postconviction petition on appeal.

Standard of Review

The denial of a defendant's motion to file a successive postconviction petition is reviewed *de novo*. *People v. Croom*, 2012 IL App (4th) 100932, ¶ 21. Similarly, the standard of review for a circuit court's decision to dismiss postconviction claims at the first stage is *de novo*.

*People v. Williams*, 186 Ill. 2d 55, 59-60 (1999); *People v. Coleman*, 183 Ill. 2d 366, 378 (1998). We first turn to consider whether defendant's second postconviction petition was a successive petition under the Act.

¶ 32                    The Characterization of the Second Postconviction Petition

¶ 33    Generally, the Act contemplates the filing of only one petition. 725 ILCS 5/122-1(f) (West 2010). Successive petitions are disfavored and, therefore, to proceed on a successive petition a petitioner must first obtain leave of court by either asserting actual innocence or satisfying the cause-and-prejudice test. *People v. Sutherland*, 2013 IL App (1st) 113072, ¶ 16; 725 ILCS 5/122-1(f) (West 2010). To demonstrate cause, a defendant must identify "an objective factor that impeded his or her ability to raise a specific claim during his or her initial post-conviction proceedings." *Id.* To establish prejudice, a defendant must demonstrate "that the claim not raised *** so infected the trial that the resulting conviction or sentence violated due process." *Id.*

¶ 34    Defendant contends the circuit court erred in characterizing his second petition as successive because his initial petition only sought to reinstate his right to a direct appeal and, consequently, his second petition represents the first opportunity for defendant to raise his claims in a postconviction proceeding. Defendant relies on *People v. Little*, 2012 IL App (5th) 100547, ¶ 19, to support his proposition that where a defendant files an initial postconviction petition seeking only to reinstate the right to a direct appeal that was lost due to counsel's ineffectiveness, a subsequent petition is not a successive petition under section 122-1(f) of the Act. Defendant further contends that because his second *pro se* petition was not a successive petition, the circuit court erred in dismissing the petition based upon the petition's failure to meet the requirements of the cause-and-prejudice test.

¶ 35    In response, the State contends *Little* is not implicated in this case because the circuit court ruled on defendant's petition within 90 days and complied with *People v. Hodges*, 234 Ill. 2d 1 (2009).

¶ 36    In *Little*, the question before the reviewing court was whether a subsequent postconviction petition is considered successive under the Act, where the initial petition only sought to reinstate the right to a direct appeal that was lost due to counsel's ineffectiveness. *Little*, 2012 IL App (5th) 100547, ¶ 19. The defendant filed a *pro se* postconviction petition alleging his trial counsel was ineffective for failing to file a notice of appeal, despite the defendant's request to do so. *Id.* ¶ 6. The defendant requested the circuit court grant him leave to file a late notice of appeal, which the court allowed. *Id.* ¶¶ 6, 8. After his appeal was disposed, the defendant filed a second *pro se* postconviction petition claiming, among other things, his appellate counsel was ineffective for proceeding on direct appeal without a complete and adequate record. *Id.* ¶ 9. Noting that the defendant had already filed a " 'first petition,' " the trial court denied what it construed as the defendant's " 'request for leave to file a successive [postconviction] petition.' " *Id.* ¶ 10.

¶ 37    On appeal, the reviewing court held that when a defendant files a postconviction petition seeking only to reinstate the right to a direct appeal that was lost due to counsel's ineffectiveness, a subsequent postconviction petition is not considered successive under the Act. *Id.* ¶ 19. This is because a defendant has a right under the Illinois Constitution to appeal a criminal conviction, and a statutory right to "one complete opportunity" to collaterally attack his conviction with a postconviction petition. *Id.* ¶ 21. Where defendant's first petition was

filed only to rescue his right of appeal, "it was not a 'true collateral attack' and should not be counted as such." *Id*. The appellate court further determined that the defendant's second petition must be docketed for second-stage proceedings because the trial court failed to review the second petition within 90 days to determine whether it was frivolous and patently without merit. *Id*. ¶¶ 23-24.

¶ 38 In this case, defendant filed the initial petition on May 28, 2009, alleging his trial counsel was ineffective for failing to file a notice of appeal, despite defendant's request to do so following his conviction and sentence. On June 29, 2009, the circuit court granted defendant's requested relief and he was allowed to file a late notice of appeal. Defendant's appeal then proceeded and was disposed of on December 15, 2010. On June 24, 2011, defendant filed the second *pro se* petition alleging, among other arguments, that his appellate counsel was ineffective for not raising his trial counsel's failure to object to the ASA's remarks that the witnesses feared being shot and killed by defendant. As the initial petition filed on May 28, 2009, was not a true collateral attack, defendant's second *pro se* petition filed on June 24, 2011, was his first opportunity to seek collateral review and, therefore, was not a successive petition for purposes of the Act. See *id*. ¶ 21.

¶ 39 We acknowledge that this court is not always bound by decisions of other appellate court districts. *In re May 1991 Will County Grand Jury*, 152 Ill. 2d 381, 398 (1992). However, there may be compelling reasons to do so when dealing with similar facts and circumstances, unless a district has made a determination of its own contrary to that of another district. *Id*.; *People v. Ward*, 192 Ill. App. 3d 544, 554 (1989). The facts in the present case are substantially similar to those of *Little*, thereby warranting the same result. Moreover, there is an absence of prevailing authority from our highest court as well as from the First District.

¶ 40 In addition, we agree with the Fifth District's rationale. Under the Illinois Constitution, "the right to appeal a criminal conviction is fundamental." *People v. Ross*, 229 Ill. 2d 255, 268 (2008). Further, section 122-1(f)'s reference to "one petition *** without leave of the court" (725 ILCS 5/122-1(f) (West 2010)) indicates one complete opportunity to collaterally attack "the proceedings which resulted in his or her conviction" (725 ILCS 5/122-1(a)(1) (West 2010)). Thus, where, as here, a defendant has been denied that opportunity, he should be " 'restored to the procedural posture he would have enjoyed if he had been represented by effective counsel who had timely filed a notice of appeal.' " *Little*, 2012 IL App (5th) 100547, ¶ 21 (quoting *Urinyi v. United States*, 607 F.3d 318, 321 (2d Cir. 2010)). For all the aforementioned reasons, we find no reason to depart from the *Little* court's holding on this issue.

¶ 41 Here, the circuit court found the second *pro se* petition was a successive petition. It is unclear from its written order, however, whether the circuit court dismissed the petition based on the cause-and-prejudice test or the frivolous-and-patently-without-merit test. Initially, the circuit court discussed and considered the cause-and-prejudice test. However, in the concluding paragraph of the order, the circuit court found the petition to be frivolous and patently without merit. If the circuit court in fact treated defendant's petition as successive and applied the cause-and-prejudice test, this rationale, pursuant to *Little*, would have been improper. Instead, defendant's petition should have been considered an initial first-stage petition and reviewed accordingly. See 725 ILCS 5/122-2.1(a)(2) (West 2010); *Hodges*, 234 Ill. 2d at 10. Even if defendant's petition was reviewed for cause and prejudice, we are not required to reverse the dismissal of defendant's petition because we can affirm for any basis

that appears in the record. See *People v. Quigley*, 365 Ill. App. 3d 617, 619 (2006). For the reasons stated herein, we find defendant's petition to be frivolous and patently without merit and affirm the trial court's dismissal of the petition.

¶ 42                               Whether Defendant's Second Petition Was
                                     Frivolous and Patently Without Merit

¶ 43    The Act provides a remedy to criminal defendants whose federal or state constitutional rights were substantially violated in their original trial or sentencing hearing. *People v. Pitsonbarger*, 205 Ill. 2d 444, 455 (2002); 725 ILCS 5/122-1 *et seq.* (West 2010). In noncapital cases, the Act creates a three-stage procedure for relief. *People v. Boclair*, 202 Ill. 2d 89, 99 (2002); *People v. Hobson*, 386 Ill. App. 3d 221, 230-31 (2008). At the first stage, the circuit court has 90 days to review the petition and may summarily dismiss it if the trial court finds that the petition is frivolous and patently without merit. *Hodges*, 234 Ill. 2d at 10. In the second stage of a postconviction proceeding, the defendant bears the burden of making a substantial showing of a constitutional violation. *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006). Once amendments, if any, are made to the postconviction petition, the State is then allowed to file a motion to dismiss the petition. 725 ILCS 5/122-5 (West 2010). The circuit court must then determine whether the petition, including any attached documents, presents a substantial showing of a constitutional violation. 725 ILCS 5/122-6 (West 2010). If such a showing is made, then the petition proceeds to the third stage, where the circuit court conducts an evidentiary hearing on the merits of the petition. *Id.*

¶ 44    Here, defendant's petition was at the first stage where the threshold for survival is low. *Hodges*, 234 Ill. 2d at 9. The petition need only present a limited amount of detail and need not set forth the claim in its entirety. *People v. Edwards*, 197 Ill. 2d 239, 244 (2001). The circuit court acts strictly in an administrative capacity by screening out those petitions that are without legal substance or are obviously without merit. *People v. Rivera*, 198 Ill. 2d 364, 373 (2001). The court will dismiss the petition if it determines the petition is frivolous or patently without merit (725 ILCS 5/122-2.1(a)(2) (West 2010)), meaning that it has no arguable basis in law or in fact. *Hodges*, 234 Ill. 2d at 16. A petition lacks an arguable basis in law or in fact if it is based on an indisputably meritless legal theory or a fanciful factual allegation. *Id*.

¶ 45    Defendant argues his petition set forth the gist of an arguable claim that his appellate counsel was ineffective for failing to raise an issue on direct appeal concerning the ASA's improper closing argument. Defendant further argues the ASA's remarks regarding the reason the eyewitnesses delayed in cooperating with the authorities–fear of defendant–were not supported by the record. Defendant also asserts these remarks amounted to the ASA's own opinion and were an improper attempt to bolster the witnesses' credibility. Defendant additionally asserts it is at least arguable that he would have prevailed on direct appeal because there was no physical evidence linking defendant to the shooting, defendant did not confess, and the three identification witnesses waited several months after the shooting before cooperating.

¶ 46    A first-stage petition claiming ineffective assistance of counsel must establish: (1) that it is arguable that counsel's performance fell below an objective standard of reasonableness; and (2) that it is arguable that the defendant was prejudiced by counsel's performance. *Hodges*, 234 Ill. 2d at 17; see also *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The standard set out in *Strickland* also applies to claims of ineffective assistance of appellate counsel. *People v.*

*Rogers*, 197 Ill. 2d 216, 223 (2001). "If a reviewing court finds that the defendant did not suffer prejudice, it need not decide whether counsel's performance was constitutionally deficient." *People v. Buss*, 187 Ill. 2d 144, 213 (1999). While generally a defendant must overcome the strong presumption that the challenged actions of counsel were the product of sound strategy (*Strickland*, 466 U.S. at 689; *People v. Manning*, 241 Ill. 2d 319, 327 (2011)), we do not consider arguments related to strategy when reviewing first-stage postconviction petitions. *People v. Tate*, 2012 IL 112214, ¶ 22.

¶ 47 We turn to the question of whether defendant's petition sufficiently set forth a claim that the ASA's closing argument was improper, such that defendant was prejudiced by his appellate counsel's failure to raise this issue on direct appeal. Generally, an ASA has wide latitude in making a closing argument, and may comment on the evidence and any fair, reasonable inferences it yields, even if such inferences reflect negatively on the defendant. *People v. Nicholas*, 218 Ill. 2d 104, 121 (2005). Assumptions and statements of fact not based on evidence, however, may not be argued to the jury. *People v. Armstead*, 322 Ill. App. 3d 1, 14 (2001). Moreover, we consider the challenged comments in the context of the entire closing argument of both parties. *People v. Williams*, 192 Ill. 2d 548, 573 (2000). While the ASA's remarks may sometimes exceed the bounds of proper comment, the verdict must not be disturbed unless the remarks resulted in substantial prejudice to the accused and, absent those remarks, the verdict would have been different. *People v. Byron*, 164 Ill. 2d 279, 295 (1995).

¶ 48 Here, the ASA's remarks about the witnesses' reluctance to cooperate with prosecuting authorities cannot be deemed improper. Sain, Carter, and Ware testified they did not want to get involved after the shooting. Sain testified he was the subject of outstanding warrants, Carter testified he did not want to get involved, and Ware testified he was "scared a little bit." The circumstances surrounding the shooting support an inference that Sain, Carter, and Ware would also not want to get involved because they feared defendant. All three had been in close proximity to the incident, in which they observed defendant walk up to Blaylock and shoot him. Immediately after the shooting, defendant fled and could still have been at large, while Sain, Carter, and Ware remained in the area. Given the circumstances, the ASA's remarks were based on reasonable inferences from the evidence.

¶ 49 Even assuming for the sake of argument the comments were improper, defendant's claim still fails because he has not demonstrated his conviction resulted from the improper comments. Absent the ASA's comments about the witnesses' fear, the evidence against defendant was overwhelming and the result of the trial would not have been different. *People v. Evans*, 209 Ill. 2d 194, 220 (2004). Although the three eyewitnesses did not immediately cooperate with the police, they did inform members of defendant's family of what occurred. When the witnesses cooperated with the investigation, they repeatedly identified defendant as the shooter. Sain signed a statement and identified defendant as the shooter while in jail in Wisconsin, and Carter and Ware both identified defendant as the shooter in photo arrays, signed a statement, and testified before a grand jury. Because the ASA's comments were not a material factor in defendant's conviction, there is no arguable basis in law for defendant's claim that his appellate counsel was ineffective. See *People v. Cole*, 2012 IL App (1st) 102499, ¶ 23. Accordingly, defendant's claim is dismissed as frivolous and patently without merit.

CONCLUSION

¶ 51          For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 52          Affirmed.

¶ 53          JUSTICE LAMPKIN, specially concurring.

¶ 54          I concur in the judgment only. I add that the circuit court issued an eight-page order in which it first reviewed the petition as a successive petition for postconviction relief and found that petitioner failed to meet the "cause-and-prejudice" test required to relax the rule prohibiting successive petitions. This analysis was completed in the first 2½ pages of the circuit court's order. The court then continued by reviewing the merits of each of petitioner's ineffective assistance of counsel claims on pages 3 to 8, concluding as to each that they were without merit and/or did not prejudice the petitioner. Specifically, the court found that: no prosecutorial misconduct was committed when the State suggested in closing argument that the petitioner fled the jurisdiction to avoid prosecution as it was supported by the evidence; petitioner was not prejudiced by his absence in court when the court and both counsel for the State and the defense answered two questions from the jury; the State's argument that witnesses were scared was not improper because it was a reasonable inference to be drawn based on the evidence presented at trial; and the State did not improperly shift the burden of proof to the petitioner.

¶ 55          The court, after addressing and finding these contentions lacked merit "decline[d] to deem 'patently erroneous' appellate counsel's assessment of the record, and decision not to raise those issues." The court continued by saying petitioner had failed to make the requisite showing of either deficient performance or sufficient prejudice, thereby defeating his ineffectiveness claim. In its conclusion on page 8 the court found that the "issues raised and presented by petitioner are frivolous and patently without merit" and dismissed the petition.

¶ 56          The court, in my view, first addressed the petition as successive and, thereafter, clearly addressed this petition as a first-stage petition within the first 90 days that it was on the judge's call.