**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2023 IL App (3d) 210060-U

Order filed August 11, 2023.

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2023

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of the 10th Judicial Circuit, |
| Plaintiff-Appellee, | ) | Peoria County, Illinois. |
| | ) | |
| v. | ) | Appeal No. 3-21-0060 |
| | ) | Circuit No. 16-CF-143 |
| VERONICA R. DIXON, | ) | |
| | ) | The Honorable Paul Gilfillan, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE McDADE delivered the judgment of the court.
Justices Davenport and Hettel concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*:  The trial court properly dismissed defendant's *pro se* postconviction petition at the first stage because she failed to establish any prejudice from (1) appellate counsel's failure on direct appeal to argue the insufficiency of the State's evidence; and (2) the absence of a *Prim* instruction in response to a note from the jury suggesting that it was approaching an impasse when the trial court did not abuse its discretion in deciding when to issue that instruction.

¶ 2    Defendant, Veronica Dixon, was convicted of criminal sexual assault and aggravated sexual abuse for having sex with a minor student, and her convictions were upheld on direct appeal. In a *pro se* postconviction petition, she alleged that her appellate counsel provided

ineffective assistance by failing to argue on direct appeal that the State had not carried its burden of proof because the evidence failed to establish her guilt beyond a reasonable doubt. She also asserted that the trial court erroneously responded to a note from the jury that suggested a deadlock and that defense counsel was ineffective for failing to object to that response or to offer an alternative response. The trial court summarily dismissed her petition at the first stage of the postconviction proceedings. We affirm.

¶ 3                                              I. BACKGROUND

¶ 4         Defendant was a 28-year-old schoolteacher when she was charged in 2016 with one count of criminal sexual assault and one count of aggravated sexual abuse based on allegations of sexual conduct with one of her students, D.D., who was then 14 or 15 years old. During defendant's February 2017 trial in Peoria County circuit court, the State presented testimony from several witnesses, including D.D.'s mother. She testified that defendant was the homeroom teacher for D.D. and two of her other children, daughters R.D. and T.D. D.D. also testified, explaining that he knew defendant from speaking to her when picking up his sisters before he transferred to her class in January 2016. He recounted how defendant asked him to go jogging with her one day after school and stated that he also knew she dreaded hair and asked for her phone number because he was interested in making an appointment. After defendant added the Text Now application to her cellphone at D.D.'s suggestion, the two stayed in touch through text messages and calls.

¶ 5         Shortly before his fifteenth birthday in January 2016, D.D. texted defendant suggesting that she pick him up at his cousin's house and take him to her home, although he was unable to find that text among the State's trial exhibits. He testified that the two met to have sex. When they arrived at defendant's home, they kissed in the kitchen while defendant's children were in

2

her bedroom. D.D. and defendant then moved to her son's bedroom, which she opened with a screwdriver because the doorknob was missing. They engaged in oral and vaginal sex before having dinner with defendant's children. After that, defendant drove D.D. home. D.D. testified that he was in love with defendant and referred to her as his girlfriend in text messages. In her responses, defendant stated that she loved him, too.

¶ 6 In mid-January, D.D. revealed to his stepfather that he had had sex with defendant. At the time, the stepfather believed that D.D. "was probably just, you know, a child playin', want to play Mr. Big Guy or something." On January 25, however, the stepfather answered a cellphone used by D.D. and recognized defendant's voice. D.D.'s mother then examined the phone and found several text messages between D.D. and defendant. Although she knew that defendant had previously taken some of her other children roller skating and that they had helped her grade papers, she did not know that her children had ever been to defendant's house or that D.D. and defendant had been communicating outside of school. The mother testified that the texts she found included defendant's name and talked about defendant "loving" D.D. "Him loving her. Picking him up." After finding those messages, the mother sent defendant a text from D.D.'s phone. Defendant answered by asking why their phone call had been cut short. When the mother stated that defendant was talking to D.D.'s mother, defendant stopped responding and instead called D.D.'s 12-year-old sister, R.D., who put the call on speakerphone.

¶ 7 During that January 25 call, defendant said that D.D. was "tripping" and that he "knows he cannot tell people what was going on." She also sent texts to R.D. saying that she was "scared" after the text exchange with his mother. R.D. testified to seeing other texts that referred to D.D. and defendant having sex, but she believed that D.D. had deleted them "because he

3

didn't want [defendant] to get in trouble." The next day, mother took four of the cellphones used by her children to the police, but D.D. refused to accompany her.

¶ 8        At the police station, the mother met with Detective Robert Vasquez, who copied the texts on D.D.'s phone and took a screenshot of the following text exchange between R.D. and defendant:

> "Defendant: Yo [*sic*] mom just texted me
>
> R.D.: What She Say ?
>
> Defendant: Nothin [*sic*] just said this his mom thats [*sic*] all
>
> R.D.:  Awe [100 and OK sign]
>
> Defendant: Lol aw
>
> R.D.: Yeah Wyd? [What are you doing?]
>
> Defendant: Idk [I don't know] I'm scared now Homework with my
>
> son."

Detective Vasquez testified that he saw numerous text communications on the phone that occurred over several days. Those messages included references to defendant as D.D.'s "bae," meaning his "girlfriend" or "before all else," and stating how much they loved and missed each other. One message from January 13, 2016, stated:

> "Defendant: See u tmrw [tomorrow]
>
> D.D.: Ight Bae [all right, girlfriend]
>
> Defendant: LOL Dnt u got hmwk?
>
> D.D.: Nope
>
> Defendant: Yes u do!

D.D.: Nah I don't"

The following night, D.D. sent defendant another message:

"D.D.: Bae

Defendant: Quit playin [*sic*] with me

D.D.: Wat [*sic*] u mean quit playing bae u know I wanna f***

again nd [*sic*] call me."

Two hours later, defendant initiated another text exchange with D.D.:

"D.D.: Hi

Defendant: Wats [sic] up

D.D.: Nun [nothing] missing u hbu [how about you]

Defendant: Just tired missin [*sic*] the old u

D.D.: Aww well u will see him again tm [tomorrow]

Defendant: I sholl [*sic*] will b waitin [*sic*]

D.D.: Lol u so goffy [*sic*] veronica

Defendant: Wat [*sic*] an ugly name lol

D.D.: Nah its cute for u

Defendant: Nah im [*sic*] coo [*sic*]

D.D.: Lol

Defendant: I gotta go! [hand making a peace sign]

D.D.: Otay [*sic*] luv [*sic*] u

Defendant: Luv [*sic*] u 2

D.D.: Awww

5

Defendant: Gn [goodnight]

D.D.: Nah don't go to sleep bae

Defendant: 2 tired hurt

D.D.: Bae nvm [never mind] gn luv u

Defendant: Luv u

D.D.: Ilym [I love you more]"

¶ 9 The text stream between defendant and D.D. continued for several more days, ending after D.D's mother took him to the police station on January 25. At that time, D.D. told police about his sexual relationship with defendant and showed them where she lived.

¶ 10 After obtaining a search warrant, the police seized three cellphones and an Apple iPad from defendant's house. The police later copied the data from the equipment and generated some reports. Their investigation revealed the Text Now application had been installed on defendant's phone on January 10, 2016, and deleted on January 25, 2016, and that all the Text Now messages on her phone had also been deleted. The reports and transcripts of the text messages were admitted into evidence by the State.

¶ 11 In her case, defendant introduced testimony from another student who was in her homeroom at the time the texts with D.D. were sent. That student stated he installed an application called Betternet on defendant's tablet in mid-January after her phone broke. He explained how she helped him with homework after school, sometimes at his home, when he was struggling and gave him a ride home from school. When students in her class misbehaved, he described how she would tell them that "she love us and we can do better and stop acting hard-headed." Defendant's co-teacher testified that, when necessary, she permitted students to use her cellphone.

6

¶ 12    Defendant also took the witness stand and denied any inappropriate conduct with D.D. As part of her teaching model, she tried to work with students so they would remain in school instead of sending them for disciplinary action. She also engaged with students after school, playing basketball, jogging, and coaching basketball with students. Sometimes she took students roller skating and to basketball games. At times, she also took them to her home for snacks; she admitted that she did not obtain prior parental consent.

¶ 13    Defendant described how D.D. became one of her students in January 2016 after failing to pass seventh grade. Before D.D. was her student, she already knew him from teaching his sisters. On his first day in class with defendant, D.D. asked for her business card because he wanted to get his hair done for his upcoming birthday. He subsequently began to flirt with her and call her "bae," which she said she told him was not appropriate. He also began to text her, even though she knew it was contrary to school policy to have electronic communication with students on school equipment. She testified that she had offered to go jogging with students in her class after school, but D.D. was the only student who joined her. After her phone broke, she had another student install a phone application on her tablet and later allowed D.D. to use her new phone during class. D.D. and defendant also became Facebook friends.

¶ 14    In her testimony, defendant acknowledged that D.D. came to her house on January 14, but she claimed that he was there to have his hair done. She described putting dinner in the oven after arriving home and then tending to her young children. She recounted helping her daughter get out of her son's room, where she was trapped, by using a detached doorknob, not a screwdriver as D.D. had testified. When defendant's boyfriend texted her asking for a ride, she left to pick him up. She explained that her boyfriend's text message may not have been recovered due to the type of phone plan he had. When D.D. texted her later that day suggesting

7

that they have sex again, defendant did not respond. She did not report the message to the school, claiming at trial that she was afraid he would be expelled if she did.

¶ 15       Defendant also explained that she was attempting to reschedule D.D.'s hair appointment when she reached his mother on his phone. She deleted the Text Now application from her phone because she "panicked" and "knew what it looked like." She admitted lying to police when she said D.D. had never been to her house, suggesting that she lied because she "was scared. Like, I had already been walked out of my job."

¶ 16        In  rebuttal, the State introduced additional testimony from Detective Vasquez about his interview with defendant. The interview was videotaped; during it, defendant denied that D.D. had ever come to her house or that she had sent him any text messages. The videotape also included two references to a polygraph test. The jury saw six short video clips from the interview that showed each of her denials, with the final clip showing defendant's admission that D.D. had indeed been to her home. The jury did not view the portions of the videotape that referred to a polygraph test. The full three-hour video recording became State's exhibit No. 10, but it was not published to the jury.

¶ 17       Defendant was also interviewed by the Department of Children and Family Services (DCFS). In that videotaped interview, she indicated that she had reported her boyfriend to police for physical violence but he had not been arrested because the police did not believe her account.

¶ 18       During closing arguments, defendant's counsel explained her conduct by claiming that she was flirting with D.D. to keep him in school. On the third day of trial, the jury began to deliberate around 1 p.m. and, within only a few minutes, sent a note requesting a transcript of D.D.'s testimony, which was then provided. Around 3:30 p.m., the jury sent another note asking to review the discs containing defendant's phone data. After conferring with the parties, the trial

8

court responded that the relevant evidence on the discs, including the Text Now message logs, had already been admitted through the trial testimony or had been given to the jury on paper. The trial court encouraged the jurors to rely on their memories when considering the testimonial evidence.

¶ 19 The jury later sent a third note indicating that it could be deliberating after 5 p.m. and asking "[a]t what point do we decide to reconvene in the morning? We'll continue to deliberate in the meantime." The court answered that "you may deliberate as late as you like. Let us know when you reach a verdict." Shortly before 6 p.m., the judge sent a note to the jury with three options: (1) continue the deliberations and have dinner brought to them; (2) end the deliberations for the night and return the next morning; or (3) continue the deliberations without stopping for dinner. The jury chose the first option. Around 6:20 p.m., the jury sent a note requesting a transcript of defendant's testimony. The trial court responded that a transcript would take an hour to prepare. The court told the parties that the jury would be retired for the night if it sent more questions out after 7:30 p.m. and would reconvene the next morning to continue its deliberations.

¶ 20 Around 9:15 p.m., the judge told the parties the jury would be retired at 9:45 p.m. if it had not yet concluded its deliberations. Defense counsel stated, "Honestly, I wouldn't have a problem with just releasing them now. Just allow them to have a clean slate tomorrow morning and get out of here." When the jury was informed that it could deliberate until 9:45 p.m., it returned a note stating, "[W]e believe we are at impasse where further deliberation will not lead to a unanimous decision. The primary reason for this impasse is the point of reasonable doubt and burden of proof by the State. Given this, we need direction on how to proceed or where compromises are appropriate." Recognizing the length of time that the jury had been deliberating, the trial court remarked that a request for additional directions on how to

9

compromise "is not something the Court is going to address and not something that 12 tired people should reasonably be expected to digest or add to their now nine and a half hours of deliberation." With the parties' agreement, the trial court informed the jury that it would not be given a definition of reasonable doubt and that the jury would be retired for the night. Jurors were told to return to court by 10:15 a.m. to continue their deliberations and were instructed not to discuss the case with anyone.

¶ 21        Shortly after the jury reconvened the next morning, it sent a note requesting records from defendant's phone that had been admitted as State's exhibit No. 9. The court conferred with the parties before responding that "the witness was questioned regarding Exhibit 9. However, as a result of her responses to the questions, it was not necessary to admit Exhibit 9, although it could be referred to." At approximately 11:20 a.m., the jury reached a verdict, finding defendant guilty of both criminal sexual assault and aggravated sexual abuse. At sentencing, the two counts were merged; defendant was sentenced to four years in prison, with mandatory supervised release of three years to life.

¶ 22        On direct appeal, defendant argued that she was denied a fair trial because the jury received the full video of her DCFS and police interviews, which included references to a polygraph test, a DCFS investigation, and her domestic abuse allegation. This court affirmed her convictions. *People v. Dixon*, 2019 IL App (3d) 170245-U.

¶ 23        In October 2020, defendant filed a *pro se* postconviction petition alleging that the State had not proven her guilty beyond a reasonable doubt and that her counsel on direct appeal was ineffective for failing to raise that argument as well. She also asserted that the trial court's response to the jury's note suggesting it was reaching an impasse was erroneous and that her trial counsel was ineffective for failing to object to that response. The trial court summarily dismissed

10

her petition. Defendant filed a late *pro se* notice of appeal, which was allowed by this court. While her appeal was before this court, defendant was represented by the office of the State Appellate Defender.

¶ 24                                   II. ANALYSIS

¶ 25        In the instant appeal, we must consider whether the trial court erred in summarily dismissing defendant's *pro se* postconviction petition during first stage postconviction proceedings. Defendant's *pro se* petition alleged that her appellate counsel provided ineffective assistance on direct appeal by failing to raise: (1) the sufficiency of the evidence and (2) the flawed responses of both the trial court and defense counsel to the jurors' note asserting their possible deadlock.

¶ 26        At the initial stage of postconviction proceedings, the trial court must accept the truth of the petition's allegations and decide whether it " 'is frivolous or is patently without merit.' " *People v. Hodges,* 234 Ill. 2d 1, 10 (2009) (quoting 725 ILCS 5/122-2.1(a)(2) (West 2006)). To avoid summary dismissal, the petition "must set forth some facts which can be corroborated and are objective in nature or contain some explanation as to why those facts are absent." *People v. Delton*, 227 Ill. 2d 247, 255 (2008). This court reviews the summary dismissal of a postconviction petition *de novo. People v. Knapp*, 2020 IL 124992, ¶ 39.

¶ 27        Although any issue that could have been raised on direct appeal, but was not, is generally forfeited, the forfeiture doctrine is relaxed if the postconviction petition asserts ineffective assistance by both trial counsel and by appellate counsel for not raising the issue on direct appeal. *People v. English*, 2013 IL 112890, ¶ 22. To establish ineffective assistance of counsel, the defendant must make a two-part showing, demonstrating that (1) appellate counsel's performance was deficient and (2) but for counsel's errors, a reasonable probability exists that

11

defendant would have prevailed on appeal. *Strickland v. Washington*, 466 U.S. 668, 694 (1984); *People v. Albanese*, 104 Ill. 2d 504, 526 (1984). "The *Strickland* standard applies equally to claims of ineffective appellate counsel, and a defendant raising such a claim must show both that appellate counsel's performance was deficient and that, but for counsel's errors, there is a reasonable probability that the appeal would have been successful." *People v. Petrenko*, 237 Ill. 2d 490, 497 (2010) (citing *People v. Golden*, 229 Ill. 2d 277, 283 (2008)).

¶ 28    Appellate counsel's performance will not be deemed deficient merely because counsel failed to raise "every conceivable issue on appeal," however, counsel is expected to "exercise professional judgment to select from the many potential claims of error that might be asserted on appeal." *People v. Williams*, 209 Ill. 2d 227, 243 (2004). A defendant's showing of a "reasonable probability" that the outcome of the case would have been different but for counsel's error is insufficient to avoid first-stage dismissal if that showing is based on speculation. *People v. Viramontes*, 2017 IL App (1st) 160984, ¶ 53. If a defendant fails to establish prejudice, the reviewing court need not consider the reasonableness of counsel's professional performance. *People v. Wilson*, 2014 IL App (1st) 113570, ¶ 46.

¶ 29                          A. The Sufficiency of the Evidence

¶ 30    Defendant argues that appellate counsel provided ineffective assistance on direct appeal by failing to assert the insufficiency of the evidence to prove her guilty beyond a reasonable doubt, as mandated by due process (U.S. Const., amend. V, XIV; Ill. Const. 1970, art. I, § 2). When reviewing the merits of a defendant's reasonable doubt argument, we consider whether any rational factfinder could have found that the essential elements of the offense had been established beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *People v. Collins*, 106 Ill. 2d 237, 261 (1985). We may reverse a conviction only if the evidence, when

12

viewed in the light most favorable to the State, is so unreasonable, improbable, or unsatisfactory that it creates reasonable doubt about the defendant's guilt. *People v. Evans*, 209 Ill. 2d 194, 209 (2004). Accordingly, the effectiveness of appellant's counsel relies on the viability of defendant's claim that the State's evidence was insufficient to support a constitutionally valid conviction.

¶ 31 Defendant initially contends that the evidence against her "was far from overwhelming," asserting that D.D.'s testimony was "incredible" and that her text messages with him failed to show any sexual conduct. She adds that D.D.'s family had a financial motive for asserting the sexual assault because the family had filed a civil case against the school district on that basis.

¶ 32 In support of her claim that D.D.'s account was "incredible," defendant cites his testimony that the assault occurred while her children were in the house watching television. She asserts that "it was contrary to human experience that [she] would bring D.D. to her home in order to have sex with him when her son was in a nearby room and of an age to report to other people, particularly to [defendant's] boyfriend, who also lived in the home," citing *People v. Shaw*, 2015 IL App (1st) 123157, ¶ 29 (reversing a conviction supported by evidence deemed "improbable, unconvincing, and contrary to human experience"). We find that the facts in *Shaw* are distinguishable.

¶ 33 In *Shaw*, the State relied on the victim's testimony and some surveillance video. The victim insisted at trial that the defendant had a gun during the armed robbery, describing the weapon in great detail, and reciting how the defendant pressed it into his side. When the defendant was captured shortly after the alleged robbery, however, the police did not find a gun or the money allegedly taken from the victim. Surveillance video that captured the majority of the incident failed to show a gun, suggesting that if the defendant had a gun, he must have

13

disposed of it during one of three brief episodes during which the defendant was out of camera range. With the exception of the final two minutes before his apprehension, the defendant was either beside the victim or on camera. The victim, however, never saw the defendant dispose of either the gun or the money.

¶ 34      After reviewing the evidence and the victim's inconsistent statements, the appellate court found that "[n]o reasonable person could conclude beyond a reasonable doubt that Shaw discarded a gun during either of these periods when he had neither opportunity nor motivation to do so." *Id.* at ¶ 24. "Viewing the interactions captured by the surveillance video, [the victim's] various statements to the officers and his explanation of events at trial simply were too improbable, unconvincing, and contrary to human experience to sustain the conviction." *Id.* at ¶ 29. Our review of the record in the instant case reveals that the State's evidence against defendant was far more persuasive.

¶ 35      Although defendant points to conflicting evidence about the events surrounding the offense, which left some uncertainty about whether her children were in the car when she drove D.D. to her house and how she opened the door to her son's room, those minor points do not undermine the substance of D.D.'s testimony. It is within the exclusive province of the jury to assess the credibility of the witnesses, decide the weight due to each witness's testimony, resolve any evidentiary conflicts, and draw reasonable inferences based on the evidence. On review, the jury's credibility decisions are given great weight. " 'In cases where the evidence is close ***, where findings of fact must be determined from the credibility of the witnesses, a court of review will defer to the trial court's factual findings unless they are against the manifest weight of the evidence.' *Kalata v. Anheuser-Busch Cos.*, 144 Ill. 2d 425, 433 (1991); see also *Hartrich*, 2018 IL 121636, ¶ 13 (citing *Kalata*, 144 Ill. 2d at 433)." *People v. Swenson*, 2020 IL 124688, ¶ 36.

14

"[T]he testimony of just one credible witness is sufficient for conviction." *Id.* (quoting *City of Chicago v. Morris*, 47 Ill. 2d 226, 230 (1970)).

¶ 36    Defendant maintains that the sufficiency of the evidence should have been raised on direct appeal because appellate counsel should have "realized it was contrary to human experience" to bring D.D. to her house, which she shared with her boyfriend and children, to have sex, particularly when her children were home and D.D. had been in her class for only two weeks. She insists "it is incredible to believe she would so recklessly embark on a sexual relationship with a student she hardly knew when the consequences of such a relationship [were] so dire."

¶ 37    Because the trier of fact is far better positioned than this court to determine the credibility and weight to be accorded to the witnesses' testimony (*People v. Jackson*, 2020 IL 124112, ¶ 69), we decline defendant's invitation to deem D.D.'s testimony "incredible" and "contrary to human experience" when the jury appears to have reached the opposite conclusion. We note that inferences that could have been derived from defendant's own testimony might have also affected the jury's evaluation of the parties' relative credibility. Defendant testified that she often transported students to activities in her personal car, and even took them to her own home for snacks without their parents' consent, or even knowledge. She also admitted to giving defendant and other students access to her personal cellphone and tablet; one of her former students testified that she sometimes told students in class that she loved them.

¶ 38    Moreover, despite recognizing the deep feelings that underpinned D.D.'s flirtations with her, defendant engaged in frequent, highly personal, text and phone communications with him, and they became social media friends, communications that she knew were against school policy. She continued those activities even after D.D. began to refer to her openly as his "Bae,"

15

defined at trial as "a girlfriend," or, more precisely, "before all else." Finally, when D.D. sent a text message expressing his interest in having sex with her "again," defendant did not correct him or discontinue her clandestine communications.

¶ 39　　The jury was also free to assess defendant's response to her subsequent interactions with D.D.'s parents when considering her credibility. At trial, she acknowledged that D.D.'s stepfather answered the phone when she called D.D.'s phone number to reschedule a hair appointment. Although the stepfather had initially discounted D.D.'s confession, made only days earlier, that he and defendant had had sex as "probably just, you know, a child playin', want to play Mr. Big Guy or something," the phone call from defendant raised his level of concern. When D.D.'s mother learned that defendant was communicating with him outside of school, she immediately inspected his phone and discovered texts using defendant's name that referred to defendant "loving" D.D. "Him loving her. Picking him up." D.D.'s mother then texted defendant from his phone, and defendant immediately expressed confusion about why their prior phone call had ended. In response, D.D.'s mother identified herself, and rather than explain that she was simply setting up a hair appointment, defendant immediately ceased to respond. In lieu of speaking to D.D.'s mother, defendant called his 12-year-old sister, R.D.

¶ 40　　With her call to R.D. on speakerphone, defendant claimed that D.D. was "tripping" and "knows he cannot tell people what was going on." She followed up the call with a text to R.D., stating that defendant's text exchange with D.D.'s mother had "scared" defendant. At trial, defendant explained her subsequent deletion of the Text Now application, including her texts with D.D., from her phone by saying that she "panicked" and "knew what it looked like." Similarly, she testified that she lied during her police interview by denying that D.D. ever been to her house because she "was scared. Like, I had already been walked out of my job."

16

¶ 41        Although defendant testified that she tried to work with students to keep them in school rather than subjecting them to disciplinary action, a theme repeated in defense counsel's closing argument to explain her flirtations with D.D., jurors were free to draw reasonable inferences from the witnesses' testimony in light of their own experience when making credibility determinations. See *People v. Hopp*, 209 Ill. 2d 1, 17 (2004) (stating that "[j]urors are not required to set aside the observations and inferences that they would ordinarily make"). We conclude it was not unreasonable or against the manifest weight of the evidence for the jury to credit D.D.'s consistent account over defendant's testimony. See *Swenson*, 2020 IL 124688, ¶ 36 (stating the manifest weight of the evidence standard).

¶ 42        Moreover, we reject defendant's contention that the jury erred by crediting D.D.'s testimony because it was the result of "significant" "parental pressure" "to endorse the existence of an improper relationship, even if one did not exist." Defendant asserts that the pressure for D.D. to accuse her grew after his family filed a civil suit against the school district based on the sexual assault. The motives of D.D. and his family, however, were for the jury to consider in light of the totality of the evidence before it since it was better able to observe the witnesses and to assess the validity of their testimony. *Jackson*, 2020 IL 124112, ¶ 69 (leaving the assessment of a witness's motive to lie to the province of the jury).

¶ 43        Finally, defendant's conviction did not hinge solely on the jury's credibility findings. The State also introduced transcripts of the text communications exchanged by defendant and D.D. Detective Vasquez testified that he saw numerous text messages on D.D.'s phone between the two, including one initiated by defendant on January 13 that referenced an upcoming meeting. It read:

              "Defendant: See u tmrw [tomorrow]

17

D.D.: Ight Bae [all right, girlfriend]

Defendant: Lol

D.D.: Wyd [what are you doing]

Defendant: Nothin [*sic*]

D.D.: Koo [*sic*] me too

Defendant: Dnt u got hmwk?

D.D.: Nope

Defendant: Yes u do!

D.D.: Nah I don't"

¶ 44    On the evening of January 14, D.D. sent defendant a text message with some disturbing content:

"D.D.: Bae

Defendant: Quit playin [*sic*] with me

D.D.: Wat [*sic*] u mean quit playing bae u know I wanna f***

again nd [*sic*] call me"

Two hours later, rather than correct the content of D.D.'s earlier message, defendant began the following text exchange:

"Defendant: Wats [*sic*] up

D.D.: Nun [nothing] missing u hbu [how about you]

Defendant: Just tired missin [*sic*] the old u

D.D.: Aww well u will see him again tm [tomorrow]

Defendant: I sholl [*sic*] will b waitn [*sic*]

18

D.D.: LOL u so goffy [*sic*] veronica

Defendant: Wat [*sic*] an ugly name lol

D.D.: Nah its cute for u

Defendant: Nah im [*sic*] coo [*sic*]

D.D.: Lol

Defendant: I gotta go! [hand making a peace sign]

D.D.: Otay [*sic*] luv [*sic*] u

Defendant: Luv [*sic*] u 2

D.D.: Awww

Defendant: Gn [goodnight]

D.D.: Nah don't go to sleep bae

Defendant: 2 tired hurt

D.D.: Bae nvm [never mind] gn luv u

Defendant: Luv u

D.D.: Ilym [I love you more]"

¶ 45     The next day, D.D. initiated yet another text stream with defendant:

"D.D.: Hey

Defendant: Wats [*sic*] up

D.D.: Wyd

Defendant: Chillin

D.D.: Wya [where are you]

Defendant: School Wya

19

D.D.: Home nd [*sic*] can u take me sumwhere [*sic*]

Defendant: Where

D.D.: On the hill U better not do nun [*sic*] wit [*sic*] him

Defendant: Lol I don't mess with kids! Plus nobody crazy enough
to try me except u! I guess lol

D.D.: Yea Come get me bae"

¶ 46　　　　Three days later, on January 18, defendant and D.D. started another text chat:

"Defendant: [missed call from Rinky Dink] [defendant's Text Now
name]

Defendant: My bf [boyfriend] b [*sic*] around I cnt [*sic*] answer a lot

D.D.: Awe wya

Defendant: I jus [*sic*] got hme [*sic*]

D.D.: Koo [*sic*] bae wyd"

On January 23, D.D. began this exchange:

"D.D.: Gm [good morning] bae

Defendant: Gm wat [*sic*] u doin [*sic*]

D.D.: Missing u hbu [how about you]

Defendant: Jus [*sic*] layin here [*sic*] u aint [*sic*] missin [*sic*] me u
playin

D.D.: I'm dead ass bae Imu [I miss you] alot

Defendant: Imu 2 tho [*sic*] frfr [for real, for real]

D.D.: Aww but fr [for real] I wanna see u

20

Defendant: May b later 2day"

¶ 47 After reviewing the totality of the evidence in the light most favorable to the State as we must (*Evans*, 209 Ill. 2d at 209), we conclude that it was not closely balanced as defendant contends. Although credibility undoubtedly played an important role, the State's case was not simply a matter of "he said/she said." The text exchanges between defendant and D.D. provided critical documentary evidence to be considered by the jury, which was also free to draw reasonable inferences from defendant's conduct before and after being confronted by D.D.'s parents and the police. We hold that the State's evidence was not so unreasonable, improbable, or unsatisfactory as to create a reasonable doubt about defendant's guilt.

¶ 48 Because we reject defendant's claim that the State's evidence was insufficient to establish her guilt beyond a reasonable doubt, she has failed to demonstrate that, but for appellate counsel's failure to raise that non-meritorious claim, a reasonable probability existed that she would have won reversal of her convictions on appeal. See *Strickland*, 466 U.S. at 694 (stating the relevant standard); *Albanese*, 104 Ill. 2d at 526 (adopting the *Strickland* standard in Illinois). She has failed to establish any prejudice due to appellate counsel's failure to raise that issue on direct appeal. When defendant has not established prejudice, we need not examine her claim that trial counsel's professional performance was unreasonable. *Wilson*, 2014 IL App (1st) 113570, ¶ 46.

¶ 49                    B. Failure to Give a *Prim* Instruction

¶ 50 Next, we examine whether the trial court erred by summarily dismissing the portion of defendant's *pro se* postconviction petition asserting that appellate counsel provided ineffective assistance on direct appeal by failing to raise the inadequate responses of the court and defense counsel to a note sent by the jury during its deliberations. Defendant argues that the trial court

21

should have given the jury a *Prim* instruction after it submitted a note stating, "[W]e believe we are at impasse where further deliberation will not lead to a unanimous decision. The primary reason for this impasse is the point of reasonable doubt and burden of proof by the State. Given this, we need direction on how to proceed or where compromises are appropriate." She further contends that defense counsel failed to provide effective assistance by neither objecting to the trial court's failure to give *Prim* instruction nor making a request for that instruction.

¶ 51        Since its adoption by our supreme court in *People v. Prim*, 53 Ill. 2d 62, 76-77 (1972), the *Prim* instruction was enacted as Illinois Pattern Jury Instruction (IPI) 26.07. That instruction states:

> "26.07 Deadlocked Jury Supplemental Instruction
>
> The verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree thereto. Your verdict must be unanimous.
>
> It is your duty, as jurors, to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.

22

You are not partisans. You are judges–judges of the facts. Your sole interest is to ascertain the truth from the evidence in the case." Illinois Pattern Jury Instructions, Criminal, No. 26.07 (approved July 16, 2014); *Prim*, 53 Ill. 2d at 75-76.

¶ 52        After receiving the jury's note, the fifth one sent that day, the trial court conferred with the parties, who agreed that the jurors would not receive a definition of reasonable doubt and that the court would retire them for the night, instructing them to return the next morning to continue their deliberations. The trial court observed that it had previously instructed them that it would not receive a definition of "reasonable doubt" because that was a question for them to resolve. Referring back to the note, the court explained that "[t]o make inquiry along that line and seek more directions or ask where compromises are appropriate [after 9:15 p.m.] is not something that the Court is going to address and not something that 12 tired people should reasonably be expected to digest or add to their now nine and a half hours of deliberation."

¶ 53        Defendant asserts that the trial court's response interfered with the jury's deliberations and may have resulted in juror coercion. *People v. Ferro*, 195 Ill. App. 3d 282, 292-93 (1990). She maintains that the trial court arguably should have given the *Prim* instruction both that evening before retiring the jury and the next morning before it resumed its deliberations "to protect the jurors from undue coercion." In her view, without a *Prim* instruction, any jurors who did not agree with the majority "arguably never knew that they were not to 'surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict" after deliberating for nine hours. *Hodges*, 234 Ill. 2d at 17. If that instruction had been given, jurors who believed that the State had not met its burden of proof "likely" would have continued in that belief because the evidence

23

was close. Accordingly, the trial court's decision to adjourn the jury without giving the instruction "arguably coerced the minority jurors to heed to the majority and reach a verdict" when they continued their deliberations the next day, depriving defendant of a fair trial.

¶ 54     As defendant acknowledges, however, trial courts have discretion in determining how to respond to jurors' requests for clarification.

> "[A] trial court may exercise its discretion and properly decline to answer a jury's inquiries where the instructions are readily understandable and sufficiently explain the relevant law, where further instructions would serve no useful purpose or would potentially mislead the jury, when the jury's inquiry involves a question of fact, or if the giving of an answer would cause the court to express an opinion that would likely direct a verdict one way or another." *People v. Tomes*, 284 Ill. App. 3d 514, 518 (1996).

Conversely, judicial guidance that coerces a verdict "by prodding even a single juror into surrendering views conscientiously held has been condemned as diluting the requirement of unanimity." *People v. Anthony*, 30 Ill. App. 3d 464, 467 (1975).

¶ 55     Defendant's argument relies, in part, on the closeness of evidence, a claim that we have already rejected. *Supra* ¶ 47. "[T]he mere failure to give the *Prim* instruction to a deadlocked jury is not reversible error." *People v. Wolf*, 178 Ill. App. 3d 1064, 1066 (1989). Moreover, our supreme court declared in *People v. Cowan* that the trial court possesses the discretion to decide when to give a *Prim* instruction, relying on *People v. Preston*, 76 Ill. 2d 274 (1979). *People v. Cowan*, 105 Ill. 2d 324, 328 (1985) (stating that "[t]he time when a supplemental instruction should be given is for the court to decide"). In announcing that rule, the *Cowan* court quoted

24

from *Preston*, which stated, " 'it is primarily the function of the trial court to determine, on the basis of such factors as the length of time already spent in deliberation and the complexity of the issues before the jury, when the giving of the supplemental instruction becomes appropriate.' " *Id.* (quoting *Preston*, 76 Ill. 2d at 283-84).

¶ 56    Here, the jury was actively engaged in reviewing the evidence until it was retired, as exemplified by its submission of five notes during that time. At no point prior to the jury's fifth note, submitted more than nine hours into its deliberations, did the jurors even hint at a possible deadlock. The fifth note also did not unequivocally state that the jury had become impossibly deadlocked. Rather, it stated, "[W]e believe we are at impasse where further deliberation will not lead to a unanimous decision. The primary reason for this impasse is the point of reasonable doubt and burden of proof by the State. Given this, we need direction on how to proceed or where compromises are appropriate." Giving the language used its plain and ordinary meaning, the note strongly suggests that the jurors believed that additional guidance from the court on the meaning of reasonable doubt and the State's burden of proof would advance its deliberations.

¶ 57    After considering the late hour, the lengthy period of time that the jury had already been deliberating, and the challenging and abstract topics presented in its note, the trial court concluded that any additional efforts to evaluate the meaning and application of the concepts of "reasonable doubt" and, relatedly, the burden of proof were better left for the next day, after the jurors had received an opportunity to rest. We conclude that decision did not constitute an abuse of the trial court's discretion. See *Preston*, 76 Ill. 2d at 283-84 (stating that the trial court is tasked with deciding when to give a supplemental instruction "on the basis of such factors as the length of time already spent in deliberation and the complexity of the issues before the jury").

25

¶ 58    Moreover, case law barred the court from further defining the meaning of "reasonable doubt" and the related concept of the State's burden of proof, the points of contention recited in the jury's fifth note. "Illinois law is clear that neither the court nor counsel should attempt to define the reasonable doubt standard for the jury (*People v. Speight*, 153 Ill. 2d 365, 374 (1992); *People v. Malmenato*, 14 Ill. 2d 52, 61 (1958)). The reasoning behind this rule is that 'reasonable doubt' is self-defining and needs no elaboration. *Malmenato*, 14 Ill. 2d at 61." *People v. Johnson*, 2020 IL App (3d) 130543-B, ¶ 21. Thus, any attempt by the trial court to provide the jury with additional instruction on those issues would have been improper, either serving "no useful purpose or *** potentially mislead[ing] the jury." See *Tomes*, 284 Ill. App. 3d at 518 (listing circumstances in which the decision not to answer a jury's questions is a valid use of the trial court's discretion). Thus, the trial court properly exercised its discretion by declining to address the jury's questions at that late hour.

¶ 59    Similarly, the trial court was also entitled to exercise its discretion by delaying the giving of a *Prim* instruction. *Cowan*, 105 Ill. 2d at 328; *Preston*, 76 Ill. 2d at 283-84. The first hint that the jury could be approaching an impasse did not occur prior to the note it submitted after it had been deliberating for more than nine hours. The late hour, combined with its inability to provide jurors with any additional guidance on "reasonable doubt," justified the trial court's decision to permit the jury to rest and return the next day to determine whether it was truly at an impasse. Under those circumstances, it was not unreasonable for the trial court to delay giving a *Prim* instruction. Notably, when the jury returned to its deliberations, it did not renew its prior request for clarification. Instead, it requested defendant's phone records, indicating that it was not at an impasse and was still actively considering the ramifications of the text messages exchanged between defendant and D.D. Defendant offers nothing in the record to suggest that jurors who

26

may have held minority views were being pressured or otherwise coerced to capitulate to the purported majority view. Thus, her claim that the lack of a *Prim* instruction "arguably coerced the minority jurors to heed to the majority and reach a verdict" is purely speculative. Indeed, the jury's extensive communication with the trial court during its deliberations supports the contrary conclusion, suggesting that its members were actively engaged in carefully evaluating all the evidence before reaching its verdict. After reviewing the totality of the circumstances, we hold that the trial court did not abuse its discretion by not giving a *Prim* instruction at the first sign of a potential jury impasse. See *People v. Branch*, 123 Ill. App. 3d 245, 250-51 (1984).

¶ 60        Because defendant failed to establish a reasonable probability that giving a *Prim* instruction would have changed the outcome of her trial, she is also necessarily unable to establish any prejudice from the alleged trial error. Accordingly, we also reject her claims that trial counsel and appellate counsel were ineffective for failing to raise the issue of the *Prim* instruction.

¶ 61                                    III. CONCLUSION

¶ 62        For the foregoing reasons, we affirm the judgment of the circuit court of Peoria County.

¶ 63        Affirmed.